IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GE PROPERTY & CASUALTY        )
INSURANCE COMPANY,            )
                              )   No. CV 04-727-HU
         Plaintiff,           )
                              )
    v.                        )
                              )   OPINION AND ORDER
PORTLAND COMMUNITY COLLEGE,   )
                              )
         Defendant.           )
_____)
GE PROPERTY & CASUALTY        )
INSURANCE COMPANY,            )
                              )
    Third-Party Plaintiff,    )
                              )
    v.                        )
                              )
ST. PAUL FIRE & MARINE        )
INSURANCE COMPANY and         )
COMMERCIAL INSURANCE COMPANY  )
OF NEWARK, NJ,                )
                              )
    Third-Party Defendants.   )
_____)

Mark A. Turner
Ater Wynne LLP
222 S.W. Columbia, Suite 1800
Portland, Oregon 97201
Kevin J. Kuhn
Veder, Price, Kaufman & Kammholz
222 North LaSalle Street, Suite 2600
Chicago, Illinois 60601
     Attorneys for plaintiff

///

Jerry B. Hodson
Hong Huynh
Miller Nash
111 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97204
    Attorneys for defendant

HUBEL, Magistrate Judge:

This is an action for declaratory judgment brought by GE Property & Casualty Insurance Co., now known as AIG Centennial Insurance Company (GE) against Portland Community College (PCC) and third party defendant St. Paul Fire & Marine Insurance Co. (St. Paul). GE seeks a declaration from the court that it has no duty to defend or to indemnify PCC in connection with a Voluntary Letter Agreement between PCC and the Oregon Department of Environmental Quality (DEQ), dealing with possible groundwater contamination at property owned by PCC. GE has filed a motion for summary judgment in its favor on both the duty to defend and the duty to indemnify. PCC and St. Paul have filed cross motions for partial summary judgment on the duty to defend.

## Factual Background

The property that is at the center of this dispute is called the Old SE Center Site (the Site) and is situated on SE 82nd Avenue in Portland. In the 1960s the Site comprised a large building, a small shed, a gas station, and a large parking lot. More than 20 underground injection control (UIC) drywells were scattered throughout the parking lot. The UIC drywells were designed to collect storm water from the Site; the storm water then percolated into the groundwater. Some of the UIC drywells are more than 20 feet deep. The Site also contained five underground storage tanks

OPINION AND ORDER Page 2

(USTs), three of which were used by the service station.

PCC bought the Site on June 26, 1978 and began holding classes at the site in 1979. Although PCC did not use any of the USTs, in 1985, PCC decommissioned four of them *in situ*, including three motor fuel tanks located in the area of the former gas station. Eventually, PCC purchased a larger piece of property down the street and put the Site on the market. In the summer and fall of 2003, PCC assessed the Site's current environmental conditions, investigating and assessing all drywells. Analysis of soil samples collected from the bottom of the drywells during the investigation revealed that UICs #4 and #33 had metals and volatile organic compounds that exceeded initial screening levels, thus requiring further investigation.

Under Oregon law, OAR 340-044-0018(3), PCC was obligated to report the drywell contamination to the Oregon Department of Environmental Quality (DEQ) and to investigate the contamination to determine its extent and whether remediation was necessary. After PCC provided the requisite notice to DEQ, DEQ asked PCC to enter the Site into a voluntary cleanup program (VCP) in October 2003. PCC agreed to enter into the VCP on November 3, 2003, executing a document called a Voluntary Letter Agreement on November 3, 2003 (Voluntary Agreement). PCC seeks coverage under its Comprehensive General Liability (CGL) insurance policies for the tasks undertaken pursuant to the Voluntary Agreement. The Voluntary Agreement states, in part:

> This letter serves as a Letter Agreement between you and Oregon Department of Environmental Quality (DEQ)

OPINION AND ORDER Page 3

regarding DEQ review and oversight of the investigation and/or cleanup of hazardous substances at your property located at PCC Old SE Center Campus, 2850 SE 82nd Avenue, Portland, Oregon. DEQ requested that [PCC] enter the Voluntary Cleanup Program (VCP) due to the discovery of chlorinated solvents in soil beneath two [UIC] wells, # 4 and # 33, located in the northwest corner of the property.

Work to be completed under this Letter Agreement will include completion of a Site Investigation and Risk Assessment. The objective of the Site Investigation is to determine whether hazardous substances discovered in soil at the Property during decommissioning of [UIC] systems pose an unacceptable risk to human health through future direct contact, or have or may cause significant impacts to beneficial uses of groundwater. A second objective is to verify that no significant contamination is present in soil related to four previously decommissioned [USTs], one abandoned UST, and one hydraulic lift located at the property. DEQ will review the findings of the Site Investigation and Risk Assessment to determine whether a "no further action" determination is warranted for the site, or whether a more formal agreement is required.

***

Under this Letter Agreement, you [i.e., PCC] will... Submit a Site Investigation Work Plan to DEQ within 30 days of completion of the site visit and scoping meeting. The Work plan should be designed to identify the sources of contamination, the nature of contamination, the extent of contamination (to include an initial groundwater investigation near UICs #4 and #33), contaminant migration pathways, exposure pathways, likely receptors, and potential hot spots of contamination.

***

This Letter Agreement is not and shall not be construed as an admission by you of any liability under ORS 465.255 or any other law or as a waiver of any defense to such liability. This Letter Agreement is not and shall not be construed as a waiver, release, or settlement of claims DEQ may have against you or any other person or as a waiver of any enforcement authority DEQ may have with respect to you or the property.

McEwen Declaration, Exh. 14.

The Voluntary Agreement set out specific tasks to be done by DEQ and by PCC. PCC was to conduct site investigation and risk assessment to determine whether the hazardous substances discovered

OPINION AND ORDER Page 4

in the soil posed an "unacceptable risk to human health through future direct contact," or to "beneficial uses of groundwater." It was to submit a site investigation work plan designed to identify the sources, nature and extent of the contamination, and DEQ was to review the findings to determine whether a "no further action" determination could be issued.

PCC complied with the terms of the Voluntary Agreement. In March 2004, a site-specific risk assessment concluded that the contamination posed no significant future threat to groundwater, and that there was no need for remediation. On October 6, 2004, the DEQ sent a "no further action" determination to PCC. In January 2004, PCC sold the Site.

Between July 1, 1977, and July 1, 1978, Continental and Commercial Insurance Company (Commercial) provided CGL coverage to PCC. Between July 1, 1978, and July 1, 1982, PCC had two CGL policies with St. Paul. Compass Insurance Company replaced St. Paul and provided coverage to PCC from July 1, 1982 to July 1, 1984. GE's predecessor, Colonial Penn Insurance Co., provided CGL coverage to PCC from July 1, 1984 to July 1, 1985. GE also issued a CGL policy to PCC effective July 1, 1984 to July 9, 1985. PCC had excess coverage from Allianz between July 1, 1982 and July 1, 1984, and from Granite State Insurance Company from July 1, 1984 to July 1, 1985.

PCC gave notice of the Voluntary Agreement to all insurers, including St. Paul and GE, as soon as DEQ asked PCC to enter the Voluntary Agreement and as soon as PCC was able to reconstruct its

OPINION AND ORDER Page 5

policies and learn the identity of the insurers. PCC notified St. Paul of DEQ's claim on November 3, 2003, and notified GE on November 20, 2003. PCC demanded that St. Paul and GE defend and indemnify PCC for the claims raised in, and the activities undertaken pursuant to, the Voluntary Agreement. Because some policies had been lost, PCC also requested, pursuant to Or. Rev. Stat. § 465.479 that the insurers provide the policy form or specimen that would most likely have been issued during PCC's coverage period.

On March 16, 2004, St. Paul attached a form of its CGL policy to its reservation of rights letter. *See* Huynh Declaration, Exhibit 1. The form states that St. Paul would protect an insured from claims for "damage to tangible property resulting from an accidental event." Id. Under that form, St. Paul would not cover damages to property owned by the insured. It would, however, "defend any suit brought against [the insured] for damages covered under this agreement, even if the suit is groundless or fraudulent." On April 2, 2004, St. Paul denied coverage.

Commercial accepted the tender of defense on October 6, 2004. McEwen Declaration, Exhibit 8, p. 1. Commercial has not answered the complaint nor taken any position on these motions. PCC's other primary insurance carrier, Compass, settled with PCC out of court.

GE filed the complaint in this action on May 28, 2004, attaching a copy of the policy form that would have been issued to PCC. Complaint ¶ 6; McEwen Declaration, Exhibit 19. GE filed an amended complaint on December 24, 2004.

OPINION AND ORDER Page 6

///

**Standards**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The duty to defend is broader than the duty to indemnify, and the two duties are independent. *See, e.g.*, Western Equities, Inc. v. St. Paul Fire and Marine, 184 Or. App. 368, 374 (2002); St. Paul Fire v. McCormick & Baxter Creosoting, 126 Or. App. 689, 701, *modified on reconsideration,* 128 Or. App. 234 (1994), *aff'd in part, rev'd in part on other grounds,* 324 Or. 184 (1996). Any doubts regarding coverage are resolved in favor of the insured. See, e.g., Continental Casualty Co. v. Reinhardt, 247 F. Supp. 173 (D. Or. 1965), *aff'd,* 358 F.2d 306 (9th Cir. 1966).

**Discussion**

**A. Duty to defend**

An insurer has a duty to defend "if the allegations of the complaint in the underlying action, without amendment and with ambiguities construed in favor of the insured, could impose liability for the conduct covered by the policy." Ledford v. Gutowski, 319 Or. 397, 399 (1994); *see also* Abrams v. General Star Indemnity Co., 335 Or. 392, 400 (2003). The duty to defend is determined by reference to the insurance policy and the facts alleged in the complaint. Ledford, 319 Or. at 399; Abrams, 335 Or.

OPINION AND ORDER Page 7

at 396.

To resolve the issue of the insurers' duty to defend PCC, the court must make two inquiries: 1) whether the Voluntary Agreement is deemed a complaint; and, if so, 2) whether the "allegations" in the Voluntary Agreement could impose liability for conduct that is covered by the CGL policies.

### 1. Is the Voluntary Agreement a complaint?

PCC asserts that the Voluntary Agreement issued to PCC by DEQ is considered a "suit" or "complaint" under Oregon law:

> Any action or agreement by [DEQ] * * * against or with an insured in which [DEQ] *** in writing directs, requests or agrees that an insured take action with respect to contamination within the State of Oregon is equivalent to a suit or lawsuit as those terms are used in any general liability insurance policy.

Or. Rev. Stat. § 465.480(2)(b). The term "suit" or "lawsuit" is defined to include administrative proceedings and actions taken under Oregon or federal law, including actions taken under administrative oversight of DEQ "pursuant to written voluntary agreements, consent decrees and consent orders." Or. Rev. Stat. § 465.480(1)(a); *see also* <u>Schnitzer Investment Corp. v. Certain Underwriters at Lloyd's of London</u>, 197 Or. App. 147, 155-57 (2005)(a "suit" includes correspondence from DEQ notifying insured of its intent to list sites on environmental database and requesting further investigation or cleanup); <u>McCormick & Baxter Creosoting</u>, 126 Or. App. at 700-01 (fact that insured chooses to try to gain a more favorable resolution by cooperation instead of litigation does not mean that the agency is not making a claim that the insured is responsible for damages under the statutes governing

OPINION AND ORDER Page 8

cleanup of environmental damage).

There does not appear to be any dispute that the Voluntary Agreement is analogous to a complaint in court or charges in an administrative contested case proceeding, and therefore a "suit" within the terms of an insurer's duty to defend.

**2. Does the Voluntary Agreement allege conduct that is covered by the policy?**

a. <u>The owned property exclusion</u>

The first of St. Paul and GE's grounds for refusing to defend PCC is the owned property exclusion of the policies. The insurers assert that the Voluntary Agreement merely alleges soil contamination to PCC's own property, and that such damage is excluded from coverage under the policy's owned property exclusion.

The GE policy states:

This insurance does not apply:

(g) to property damage:

> (1) to property owned or occupied by or rented to the insured, or ... to property held by the insured for sale or entrusted to the ensured ...

St. Paul asserts that if a policy was issued to PCC by St. Paul, it would have contained the following provision:

> We won't cover damage to property you or any other protected person own, rent, occupy, use of [sic] physically control. Nor will we be responsible for any damage to premises you've sold or transferred to someone else.

*See* Nanzig Affidavit, Exhibit 1, p. 4, 6.

GE relies on cases holding that the owned property exclusion is unambiguous and enforceable in the context of soil contamination

OPINION AND ORDER Page 9

on the insured's property, such as Bauman v. North Pacific Insurance Co., 152 Or. App. 181, 187-88 (1998). In that case, while decommissioning an underground storage tank, the insured discovered soil contamination. The DEQ required the insured to clean up the contamination. The insured sought coverage for the cleanup cost and the insurer denied coverage based upon the owned property exclusion.

PCC counters that the Voluntary Agreement alleged not simply soil contamination, but possible groundwater contamination as well,[1] and argues that the owned-property exclusion does not apply to groundwater contamination. PCC relies on Lane Electric Co-op v. Federated Rural Electric, 114 Or. App. 156, 160-61 (1992), holding that contamination of groundwater is "property damage," and on Or. Rev. Stat. § 537.110 and Lane, 114 Or. App. at 161, both standing for the proposition that groundwater, like all other water within the state, belongs to the public and is within public control. See also McCormick & Baxter Creosoting, 126 Or. App. at 266

---

[1] In the Bauman case, the Court of Appeals refused to consider plaintiff's argument that there was a genuine issue of fact as to whether there was contamination of groundwater, because plaintiff failed to raise the issue in the trial court. Thus the court did not reach the issue of whether there was possible damage to third-party property as a result of groundwater contamination created by the soil contamination on the insured's property. 152 Or. App. at 185.

OPINION AND ORDER Page 10

(groundwater is property owned by the public) and Schnitzer, 197 Or. App. at 159 (owned-property exclusion does not apply to contamination of groundwater).

The Voluntary Agreement contains references to the possibility of groundwater contamination, as well as soil contamination. For example, the Voluntary Agreement states that the objective of the Site investigation is to "determine whether hazardous substances discovered in soil at the Property during decommissioning of underground injection control (UIC) systems pose an unacceptable risk to human health through future direct contact, or have or may cause significant impacts *to beneficial uses of groundwater.*" (Emphasis added) The Voluntary Agreement also specifies that PCC's work plan should be designed to identify the sources, nature and extent of contamination, specifically an "initial *groundwater investigation* near UICs #4 and #33." (Emphasis added).

However, GE argues that the language of the Voluntary Agreement really only requires PCC to perform a site investigation and risk assessment because of *soil* contamination. GE disputes PCC's argument that its agreement to perform a "risk assessment" to see if there was groundwater contamination is equivalent to an affirmative allegation by DEQ that there *was* actual groundwater contamination. GE asserts that the definition of "risk assessment" in OAR § 340-122-0115(49) supports its argument:

> "Risk Assessment" means the process used to determine the probability of an adverse effect due to the presence of hazardous substances. A risk assessment includes identification of the hazardous substances present in the environmental media; assessment of exposure and exposure pathways; assessment of the toxicity of the hazardous

OPINION AND ORDER Page 11

substances; characterization of human health risks; and characterization of the impacts or risks to the environment.

GE argues that the Voluntary Agreement required PCC to perform a risk assessment because of soil contamination, not groundwater contamination, pointing to the phrases in the Voluntary Agreement stating that DEQ has requested PCC to enter into the Voluntary Cleanup Program "due to the discovery of chlorinated solvents in soil" beneath the two UICs, and that the objective of the Site Investigation was to determine whether that soil contamination posed a risk to human health or could have a significant impact on the groundwater.

PCC has the more persuasive argument. The duty to defend arises whenever there is a *possibility* that the policy provides coverage, that is whenever the allegations of the complaint, without amendment, *could* impose liability for conduct covered by the policy. *See* Sch. Dist. No. 1 v. Mission Ins. Co., 58 Or. App. 692, 696 (1982). Stated somewhat differently, the question is whether, on the allegations contained in the Voluntary Agreement, a court would allow DEQ to put on evidence of groundwater contamination at the Site. I conclude that it would.

My conclusion is reinforced by the authority upon which GE relies, the Martin case. In holding that the insurer had no duty to defend, the court noted that the allegations in the complaint were limited to contamination in the soil. The court specifically said, "The plaintiffs *did not allege* that the contamination had migrated or *threatened to migrate* to soils off the property or to

OPINION AND ORDER Page 12

groundwater under the property." 146 Or. App. at 273-74. This suggests that if an Oregon court were presented with the Voluntary Agreement in this case, which clearly alleges that the soil contamination may have already migrated to the groundwater near UICs #4 and #33, it would find a duty to defend. Although, in this case, the environmental damage, in hindsight, was limited to soil contamination, and DEQ did not require PCC to take any remedial action, at the time of the Voluntary Agreement, there was an allegation of groundwater contamination and an order to investigate and determine its extent. Because the Voluntary Agreement raises the possibility of groundwater contamination caused by the soil contamination, the insurers' reliance on Martin is misplaced.

Further, Oregon law provides that property owners are obligated to report environmental contamination to the DEQ and to investigate the contamination to determine whether remediation is necessary. This element of legal compulsion strengthens the inference that the terms of the Voluntary Agreement should be construed as affirmative allegations rather than hypothetical statements.

I conclude that the owned property exclusion does not exonerate GE and St. Paul from the duty to defend.[2]

---

[2] In the McCormick & Baxter Creosoting case, the court seemed to acknowledge that usually, soil contamination and groundwater contamination are linked. *See* 126 Or. App. at 700, n. 10:

Insurers argue that, with the possible exception of

OPINION AND ORDER Page 13

b. <u>Are risk assessment costs considered "damages?"</u>

GE asserts that the Voluntary Agreement does not seek damages on account of property damage to groundwater; to the extent that the costs incurred by PCC in performing the site inspection and risk assessment can be considered "damages," those "damages" are the result of the discovery of soil contamination, and to the extent the costs incurred by PCC can be considered defense costs, those defense costs relate to the DEQ's claim that the soil on PCC's property was contaminated.

PCC argues that the costs of risk assessments, preliminary assessments, and remedial investigations, such as those incurred by PCC, are considered defense costs. PCC relies on Or. Rev. Stat. § 465.480(6)(a) and on <u>McCormick & Baxter Creosoting</u>, 126 Or. App. at 702.

---

> groundwater pollution, there was no evidence of damage to the property of third parties. They contend, therefore, that they were entitled to a declaration that they had no liability for the cost to M & B of repairing or cleaning up its own property, such as the soil. That would be so if the pollution to the soil is not inextricably linked to the pollution of the groundwater, for example having to clean the soil to prevent pollution to the water filtering through the soil. Whether such facts exist cannot be resolved on summary judgment.

OPINION AND ORDER Page 14

Section 465.480(6)(a) provides:

> There is a rebuttable presumption that the costs of preliminary assessments, remedial investigations, risk assessments or other necessary investigation, as those terms are defined by rule by the Department of Environmental Quality, are defense costs payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.

In McCormick & Baxter Creosoting, the insurers had argued that cleanup costs are not damages within the meaning of the insurance policies, because they are expended to prevent future harm, not to remedy past harm. The court rejected the argument, holding that the costs expended in cleaning up contamination are "damages," as that term is used in general liability policies, and that such costs are covered by those policies.

GE's argument is unpersuasive. The argument that site inspection and risk assessment costs do not constitute defense costs is explicitly contradicted by Or. Rev. Stat. § 465.480(6). The argument that the Voluntary Agreement does not seek "damages" (i.e., costs of remediation) for anything more than soil contamination is foreclosed by the court's holding in McCormick & Baxter Creosoting that cleanup costs are "damages" as that term is used in CGL policies, in combination with Or. Rev. Stat. § 465.480(6), which, through the terms "preliminary assessments" and "risk assessment," clearly contemplates situations where, as here, the nature and extent of the contamination is still undetermined. Again, the Voluntary Agreement clearly anticipated ground water contamination.

          c. <u>"Occurrence" and "accidental event"</u>

OPINION AND ORDER Page 15

An additional ground asserted by GE for its refusal to defend PCC is that the Voluntary Agreement between PCC and DEQ does not allege an "occurrence" of covered property damage during the policy period. The GE policy defines an "occurrence" as

> an event, or a continuous or repeated exposure to conditions, which causes bodily injury or property damage during the policy period that is neither knowing or [sic] intentionally caused by or at the direction of the insured.

GE continues to assert that the Voluntary Agreement alleges only that hazardous substances have been discovered in the soil, but does not allege actual damage to groundwater, much less damage to groundwater that occurred between July 1, 1984 and July 9, 1985, the policy period. GE argues that because the Voluntary Agreement "does not allege the actual existence of groundwater contamination," there is no allegation of an "occurrence" in the Voluntary Agreement. St. Paul makes a similar argument. It contends that the Voluntary Agreement merely requires PCC to determine *whether* hazardous substances discovered at the property "have or may cause significant impacts to beneficial uses of groundwater," and that there is "no indication in the Voluntary Agreement that the groundwater is contaminated." For the reasons set forth above, these arguments fail here.

As a corollary to that argument, St. Paul argues that the Voluntary Agreement also fails to allege the occurrence of an "accidental event" because it does not state when the contamination started, or what caused the contamination. St. Paul cites the case of Martin v. State Farm Fire & Cas. Co., 146 Or. App. 270 (1997),

OPINION AND ORDER Page 16

where the court held that "failing to exclude a possibility of an event is not the same as affirmatively alleging that the event has occurred."

Although this is a difficult issue, the Martin case, discussed above, and the Schnitzer case indicate that a duty to defend can be triggered by an allegation of the threat or possibility of harm, rather than an allegation of actual harm.

In Schnitzer, the court concluded that a consent order, a letter, and other documents (hereafter referred to as the "consent order") constituted a complaint for purposes of a duty to defend:

> The consent order contains DEQ's factual contentions concerning the condition of the property, the accuracy of which plaintiff did not admit.
> At the least, CNA had to treat those documents [i.e., the consent order, DEQ's June 7, 1991 letter and the accompanying documents] at that time as the functional equivalent of a judicial complaint. When read together, they described the factual basis on which DEQ sought to hold plaintiff liable for the cost of the environmental cleanup of its property. ... [A]s of September 26, 1991, CNA had the duty to defend plaintiff with regard to the actions against plaintiff being taken by the DEQ. That duty continued as to each unit until the Record of Decision for that unit was filed.

197 Or. App. at 157.

The Schnitzer court found a duty to defend had been triggered even though the consent order did not contain an allegation of actual damage to groundwater or the occurrence of a specific event that caused actual damage. Rather, the consent order merely stated that Schnitzer was to determine "the nature and extent of releases of hazardous substances on or from plaintiff's property."

In Schnitzer, the studies ultimately revealed that there was no groundwater contamination at Schnitzer's property, and Schnitzer

OPINION AND ORDER Page 17

was only required to remediate soil contamination and continue to monitor the groundwater. Nevertheless, the court rejected the argument that the owned property exclusion provided a basis for CNA's refusal to defend.

GE counters that Schnitzer is inapplicable because in Schnitzer the consent order specifically alleged the existence of groundwater contamination and indicated that the DEQ intended to impose liability upon the insured for damage to the groundwater, while in this case there is no allegation of the actual existence of groundwater contamination and no indication that the DEQ intended to impose liability upon the insured. I disagree with this reading of the case. The Schnitzer court specifically said that "the consent order by itself shows that there was a *possibility* that DEQ would require plaintiff to remedy the groundwater under the site." 197 Or. App. at 159 (emphasis added).

I also find unpersuasive GE's argument that in Schnitzer, the DEQ clearly intended to impose liability upon Schnitzer for groundwater contamination. A careful reading of the facts shows that DEQ intended to impose liability on Schnitzer if groundwater contamination were found, but that the studies ordered by Schnitzer showed soil contamination only, and DEQ required Schnitzer to remediate soil contamination only. The only requirement imposed on Schnitzer with respect to groundwater contamination was that it continue to monitor the groundwater for a period of five years.

GE also argues that in Schnitzer, the court held that the insurers were not liable for actions taken by the insured to

OPINION AND ORDER Page 18

prevent contamination--rather, the terms of the policies required payment only to repair damage that had already occurred. 197 Or. App. at 160-61. But that was the court's holding with respect to the duty to indemnify, a separate issue from the duty to defend.

This case is factually quite close to Schnitzer. In Schnitzer, as here, the "complaint" alleged soil contamination and the possibility of groundwater contamination resulting from the soil contamination. The investigation ordered included a determination of the extent of any groundwater contamination. In Schnitzer, as here, the investigation ultimately revealed that no groundwater contamination had occurred. Nevertheless, the court found the owned-property exclusion inapplicable and held that the insurer had a duty to defend that was triggered when the insured and DEQ agreed that the insured would conduct an investigation to determine the nature and extent of the contamination.

I am also unpersuaded by St. Paul's contention that there was no duty to defend because the Voluntary Agreement failed to allege when the contamination occurred and how, and by GE's contention that there was no duty to defend because the Voluntary Agreement did not allege that the contamination occurred during the coverage period of the policy. The holding in Schnitzer indicates that it is not necessary for groundwater contamination to be either directly alleged nor ultimately proven, in order to trigger a duty to defend. Nor do I see any indication in Schnitzer or in Martin that a duty to defend is not triggered absent an allegation of exactly when the contamination occurred, as St. Paul argues. The key here,

OPINION AND ORDER Page 19

as with all duty to defend cases, is that nothing in the Voluntary Agreement precluded proof that a release of contaminants within the policy period of each insurer, and from a cause within each insurer's coverage, had contaminated the groundwater. Thus a duty to defend exists.

**B.   Duty to indemnify**

The duty to indemnify is established by proof of facts demonstrating a right to coverage. <u>Western Equities</u>, 184 Or. App. at 374. PCC stated at oral argument that it was not seeking indemnity costs against the insurer, and concedes that GE is entitled to summary judgment on that issue. This motion is granted.

## Conclusion

GE's motion for summary judgment (doc. # 43) is DENIED with respect to the duty to defend and GRANTED with respect to the duty to indemnify. St. Paul's motion for partial summary judgment in its favor on the duty to defend (doc. # 47) is DENIED. PCC's motion for partial summary judgment in its favor on the duty to defend (doc. # 36) is GRANTED.

IT IS SO ORDERED.

Dated this __24th__ day of __August__, 2005.

/s/ Dennis James Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 20